IVES LABORATORIES, INC., Plaintiff,

v.

DARBY DRUG CO., INC., Inwood Laboratories Incorporated, Lowitt Laboratories, Inc., MD Pharmaceutical Company, Inc., Premo Laboratories, Inc., Rugby Laboratories, Inc., and Sherry Pharmaceutical Co., Inc., Defendants.

No. 78 C 372.

United States District Court,
E. D. New York.

Aug. 2, 1978.

Egon E. Berg, New York City, and Rogers, Hoge & Hills, New York City, for plaintiff; Vito V. Bellino, Mortimer Altin, Steven J. Baron, William F. Weigel, Marie Driscoll, Charles J. Raubicheck, of counsel.

Salon, Bloustein & Raybin, New York City (Robert V. Marrow, New York City, of counsel), for defendants Darby, Rugby, Sherry, & MD.

Kirschstein, Kirschstein, Ottinger & Cobrin, P. C., New York City (Peter T. Cobrin, New York City, of counsel), for defendant Premo Pharmaceutical.

Bass, Ullman & Lustigman, New York City (Sheldon S. Lustigman, New York City, of counsel), for defendant Inwood Laboratories.

## OPINION

NICKERSON, District Judge.

Plaintiff Ives Laboratories, Inc. ("Ives"), which manufactures and sells under the registered trademark "Cyclospasmol" a prescription drug of the generic name of "cyclandelate", brought this suit against defendants under the Trademark Act of 1946, as amended, (known as the "Lanham Act"), 15 U.S.C. §§ 1051ff., for trademark infringement and false designation of the origin of, and false description of, goods in commerce, and under New York common and statutory law for unfair competition. Plaintiff moves for an order preliminarily enjoining defendants from (1) using the trademark "Cyclospasmol" or any word confusingly similar including "Spasmol", (2) manufacturing and selling generic cyclandelate in capsules which are blue, red or a combination of blue and red, and (3) continuing other alleged acts of unfair competition.

### I

Since 1958 plaintiff Ives, a New York corporation, and its predecessors and parent company American Home Products Corporation have sold cyclandelate under the registered trademark "Cyclospasmol". The drug is a so-called peripheral vasodilator said to produce an increase in blood flow and is administered not to cure but to inhibit the progressive and debilitating conditions caused by certain vascular diseases, generally in the aged. Its use is therefore long term, for most patients a lifetime.

Before the expiry date on April 26, 1972 of a patent protecting cyclandelate plaintiff or its predecessors had the exclusive right to sell the drug in the United States. Commencing in 1962 plaintiff has marketed dosages of 200mg. in a pale blue capsule having an imprint reading "Ives 4124". Since 1975 plaintiff has sold 400mg. dosages in a red and blue capsule with the imprint "Ives 4148". Plaintiff has directed its extensive advertising and promotion of "Cyclospasmol" primarily to physicians. In addition, on personal visits to doctors plaintiff's representatives have distributed more than two million "starter" samples. Some one hundred and twenty five million of the 200mg. and 400mg. capsules have been sold since 1962. Over the past ten years such sales have exceeded $65,000,000.

Defendants are three drug manufacturers, three wholesalers, and one retail pharmacy. The three manufacturers, Premo Pharmaceutical Company, Inc. ("Premo"), Inwood Laboratories, Incorporated ("Inwood"), and MD Pharmaceutical Company, Inc. ("MD"), purchase cyclandelate powder and empty capsules and fill and sell them as generic cyclandelate to wholesalers, hospitals, retail pharmacies and others.

Premo and Inwood, both New York corporations, and MD, a California corporation, distribute 200mg. capsules of a pale blue color identical or very similar to that used by plaintiff. Premo and Inwood also distribute 400mg. capsules identical or very similar in colors to plaintiff's 400mg. capsules. Until recently none of the capsules distributed by the manufacturers bore any name or other identification. On June 26, 1978 Premo filed an affidavit stating that it in the future would imprint "Premo" on its capsules and had discontinued using unmarked capsules.

The three wholesalers, Darby Drug Co., Inc. ("Darby"), Rugby Laboratories, Inc.

("Rugby"), and Sherry Pharmaceutical Co., Inc. ("Sherry") all New York corporations, are now under common ownership and management. They purchase generic cyclandelate capsules and resell them to wholesalers, doctors, pharmacies and others.

The manufacturers and the wholesalers promote the generic product as "comparable" or "similar" or "equivalent" to "Cyclospasmol". In some catalogs they refer to the color of the capsules. For purposes of the motion it is conceded that the cyclandelate sold by defendants has the same bioavailability as "Cyclospasmol" and that the two are bioequivalent, meaning that the therapeutic ingredients in both have an equivalent effect.

Recently Sherry, which had offered the drug under the name "Spasmol", abandoned that name. The other defendants have not sold under a brand name.

Defendant Lowitt Labs Inc. ("Lowitt"), a New York corporation, is a retail pharmacy. The complaint alleges that on receiving a prescription for "Cyclospasmol" Lowitt substituted generic cyclandelate and labelled the prescription bottle "Cyclospasmol". On consent the court entered a decree enjoining Lowitt from substituting cyclandelate from another source as plaintiff's "Cyclospasmol" and from using that trademark or one so similar as to be likely to cause confusion. The claim against Lowitt is thus not at issue, and the remaining defendants will be called "the defendants".

## II

Plaintiff makes various contentions under both federal and New York State law. Plaintiff's first claim is under Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), which imposes liability for the use of a copy or colorable imitation of a registered mark in selling, distributing or advertising of goods where the use is likely to deceive or cause confusion or mistake. Plaintiff asserts two kinds of violation of this section: (1) that Sherry infringed the "Cyclospasmol" mark by using the name "Spasmol" and (2) that the defendants have been guilty of "contributory infringement" of

the "Cyclospasmol" mark. The latter claim is based on the assertion that defendants have induced pharmacies such as Lowitt to label containers of generic cyclandelate as "Cyclospasmol".

Plaintiff further contends that defendants are violating Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by adopting the colors used by plaintiff and by promoting their products as comparable or equivalent, thus making "a false designation of origin" and a "false description or representation" as to the goods.

Finally plaintiff claims that by duplicating the appearance of plaintiff's capsules thus "placing an instrument of fraud" into the hands of retail pharmacists, defendants are guilty of unfair competition under New York common and statutory law.

## III

This court has jurisdiction of the Lanham Act claims under 28 U.S.C. § 1338(a) and, since more than $10,000 is in controversy, under 28 U.S.C. § 1331(a). Those claims are sufficiently substantial to give the court jurisdiction under 28 U.S.C. § 1338(b) of the related unfair competition claims. As to MD the court also has jurisdiction under 28 U.S.C. § 1332, there being diversity of citizenship. MD has made a motion, now returnable September 1, 1978, to dismiss for lack of personal jurisdiction.

## IV

The criteria for issuance of a preliminary injunction have been stated by the Court of Appeals for the Second Circuit: a clear showing by plaintiff of possible irreparable injury and either (1) probable success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the plaintiff. *Selchow & Righter Company v. McGraw-Hill Book Company*, 580 F.2d 25, at p. 27 (1978).

Defendants contend that, even if these criteria are met, a preliminary injunction should not issue because of the delay in

bringing the action. Plaintiff, which by the summer of 1976 knew of the existence, but perhaps not the extent and manner, of some of the defendants' sales, did not file the motion until March 20, 1978.

■ Certainly as to Sherry's alleged infringement of "Cyclospasmol" by using "Spasmol" laches should not bar relief. Sherry has discontinued the name, and delay in seeking to prohibit its use has caused no harm. As to the other claims it is in the interest of the litigants and the public to decide the motion on grounds addressing the merits.

For the reasons stated in this opinion the court holds that, except for the claim of trademark infringement against Sherry, plaintiff has not made the showing prerequisite to issuance of a preliminary injunction.

### V

■ Since Sherry has discontinued the use of the name "Spasmol" the claim that it infringes "Cyclospasmol" is now of diminished significance. Sherry suggests, but does not press the point, that "Cyclospasmol" is not a valid trademark because merely descriptive of the functions of the medication. But at least in the absence of a contrary showing the court may presume a registered trademark to be valid. 15 U.S.C. § 1057(b). *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 542 (2d Cir. 1956).

Sherry also claims that the discontinuation of the name makes the matter moot. In 1977 Darby acquired Sherry and with it an inventory of cyclandelate which Sherry had been selling as "Spasmol". Assertedly that inventory has now been disposed of, orders have been and are being filled with cyclandelate sold under the Rugby name, and the name Spasmol has been deleted from the new Sherry catalog.

■ Even assuming what is stated, plaintiff is not bound to rely on Sherry's assurances. *Consumers Union of United States, Inc. v. Admiral Corporation*, 186 F.Supp. 800, 801 (S.D.N.Y.1960); *Mercury Record Corp. v. Buckingham Record Co.*, 226 F.Supp. 427, 429 (S.D.N.Y.1963). Plaintiff may therefore have a preliminary injunction against Sherry's use of "Spasmol".

### VI

Consideration of plaintiff's claims based on contributory infringement of the "Cyclospasmol" trademark, false description or false designation of origin of goods under Section 43(a) of the Lanham Act, and unfair competition under the New York law requires a tracing of the process which ends with the consumption of the product.

A patient may obtain cyclandelate only on a doctor's prescription, and New York law provides the manner in which such prescription must be made. Section 6810(6) of the Education Law requires the prescription form to state conspicuously: "This prescription will be filled generically unless physician signs a line stating 'dispense as written'." Two lines must appear on the form, one over the words "substitution permissible" and the other over the words "dispense as written."[1] The physician's signature on either validates the prescription.

Unless the physician otherwise directs, the pharmacist making a substitution must indicate on the label the name and strength of the drug and its manufacturer. Where a brand name drug is dispensed, Section 6815(2)(j) requires the pharmacist, unless the prescription otherwise explicitly states, to affix the brand name and the strength of the drug.

Any pharmacist who mislabels or makes an improper substitution is by Section 6816(1) guilty of a misdemeanor and by

---

1. Section 6816–a(1) goes further and provides that a pharmacist "shall substitute a less expensive drug" having the same active ingredients if the physician signs above the words "substitution permissible" and the drug is on a list established under the New York Health Law. Plaintiff claims that cyclandelate is not on the list, and that druggists are thus not "required" to substitute. However, they may substitute if the physician has signed on the appropriate line.

Section 6809 subject to civil monetary penalties. In addition his license may be revoked under Section 6808.

Plaintiff sells in packages identifying itself and displaying the trademark "Cyclospasmol". When he dispenses the product the pharmacist removes the capsules from plaintiff's packages and places them in containers bearing his own label. If he follows the law, the pharmacist then includes on the label, for example, "Cyclospasmol 200mg." "Ives" need not be mentioned on the label. Defendants' cyclandelate follows a similar course. Here the pharmacist must include on the label, for example, "Cyclandelate 200mg. Premo".

Plaintiff contends that defendants, by copying the colors in which "Cyclospasmol" is sold, by not imprinting (until recently in the case of Premo) their names on the capsules, and by advising pharmacists and others that the product is the generic equivalent of "Cyclospasmol", are placing an "instrument of fraud" in the hands of pharmacists, thereby unfairly appropriating business that would otherwise go to plaintiff. Plaintiff suggests not that physicians, hospitals or pharmacists are in doubt as to the identity or source of the product but rather that dishonest pharmacists, tempted no doubt by the generally lower price of the generic drug, will, quite contrary to the explicit directions of the doctors, fill prescriptions with defendants' capsules rather than those of plaintiff. The patient, says plaintiff, seeing the customary colors (and not noticing the absence of the "Ives" imprint or supposing plaintiff to have abandoned it) will assume he is getting what the doctor ordered.

Plaintiff insists that this is no mere hypothetical scenario and points to evidence that a number of pharmacies around the country have improperly filled prescriptions for "Cyclospasmol" with generic cyclandelate. Some, like Lowitt, have gone further and have falsely labeled the containers as containing "Cyclospasmol".

According to plaintiff the only effective manner in which to halt the pharmacists' practices is to reserve exclusively to plaintiff the blue and red colors. Then the consumer will be alerted by differences in color to any improper substitution. Plaintiff's argument presupposes that the temptation to the pharmacists is so great and their propensity to commit crimes and violate their duties, both contractual and statutory, is so widespread that nothing short of granting plaintiff a monopoly over the red and blue colors will stem their wanton and extensive disregard of physicians' orders. In short, only the chance that a consumer aroused by receiving an unaccustomed color will complain is sufficient to deter pharmacists from pursuing their unscrupulous ways.

## VI

In arguing for a monopoly of the red and blue shades plaintiff merely asserts an interest implicit in any claim for trademark infringement or unfair competition. To protect a trade name or symbol is to create or extend a monopoly. *Saxlehner v. Wagner*, 216 U.S. 375, 380, 30 S.Ct. 293, 54 L.Ed. 525 (1910) (per Holmes J.); *R.C.A. Manufacturing Co. v. Whiteman*, 114 F.2d 86 (2d Cir.), *cert. den.* 311 U.S. 712, 61 S.Ct. 393, 85 L.Ed. 463 (1940); *Eastern Wine Corporation v. Winslow-Warren, Ltd.*, 137 F.2d 955, 957–959 (2d Cir.), *cert. den.* 320 U.S. 758, 64 S.Ct. 65, 88 L.Ed. 452 (1943). But the law recognizes and approves monopolies of many kinds, of which patents, copyrights, and trademarks or trade names or symbols are but examples. Each serves some end sufficiently desirable to overcome the interest of society in unrestricted competition. Thus the law of trademarks and unfair competition when it secures to businesses the fruits of their initiative and enterprise is thought to encourage inventiveness, *Eastern Wine Corporation v. Winslow-Warren, Ltd., supra*, at 958, and to promote orderly and honest commercial practices, *Dwinell-Wright Co. v. White House Milk Co.*, 132 F.2d 822, 825 (2d Cir. 1948), and perhaps even morality and gentlemanliness. *Millinery Creators' Guild, Inc. v. F.T.C.*, 109 F.2d 175, 177 (2d Cir. 1940), aff'd, 312 U.S. 469, 61 S.Ct. 708, 85 L.Ed. 955 (1941);

*American Safety Table Co. v. Schreiber*, 269 F.2d 255, 272, 273 (2d Cir.), *cert. den.*, 361 U.S. 915, 80 S.Ct. 259, 4 L.Ed.2d 185 (1959). Moreover, by preventing one seller from misleading customers into believing that the goods come from another, the courts protect customers in their choices. *Benton Announcements, Inc. v. F.T.C.*, 130 F.2d 254, 255 (2d Cir. 1942).

In each instance the determination to allow the exclusive use of a symbol requires a balancing of the interest in encouraging such values against the effect on consumers of whatever inhibition of competition may ensue. Where the balance has not been struck by legislation, *cf.* 15 U.S.C. § 1057(b) (making a certificate of registration prima facie evidence of an exclusive right to use a trademark), the process will often require a court to weigh imponderables, and much can depend on which side must bear the burden of persuasion. As to that, two Supreme Court cases involving unfair competition, *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), give an unmistakable sign. Both cases involved deliberate and detailed copying of previously marketed products, and the Court ruled that it was not consistent with the policy of the patent provisions in the Constitution and the patent legislation for a state to prohibit the copying of an unpatented article. If, as the Court said in the *Compco Corp.* case, the "federal policy" found in Article I, section 8, clause 8 of the Constitution (giving Congress the power to promote science by securing to inventors for "limited" times the "exclusive" right to their discoveries) and in the implementing federal statutes is to allow "free access to copy" whatever is left by them in the public domain, 376 U.S. at 237, 84 S.Ct. 779, then the presumption must be that competition shall be the general rule and limitations on it are exceptions requiring justification. As Mr. Justice Brandeis put it in *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 122, 59 S.Ct. 109, 83 L.Ed. 73 (1938), "the consuming public is deeply interested" in the "free

exercise" of the right to share in the goodwill of an article unprotected by a patent or a trademark. "[I]mitation is the life blood of competition." *American Safety Table Co. v. Schreiber*, supra, 269 F.2d at 272. It follows that courts should be chary in granting judge-made monopolies which are both perpetual and unregulated. *Cheney Bros. v. Doris Silk Corp.*, 35 F.2d 279, 281 (2d Cir. 1929) (per L. Hand, J.), *cert. den.*, 281 U.S. 728, 50 S.Ct. 245, 74 L.Ed. 1145 (1930).

With these principles in mind we turn to the several theories on which plaintiff seeks to obtain an injunction against defendants' practices.

## VIII

Since it is the use of a "reproduction" or "copy" of a registered mark which Section 32 of the Lanham Act, 15 U.S.C. § 1114, makes improper, plaintiff's claim of so-called "contributory" infringement of the trademark "Cyclospasmol" must be based on defendants' asserted inducement of the pharmacists not merely to substitute defendants' goods for plaintiff's but wrongfully to affix the "Cyclospasmol" label. No doubt the knowing and deliberate instigation of such a practice would justify holding defendants equally with the pharmacists as infringers. *Stix Products, Inc. v. United Merchants & Mfrs.*, 295 F.Supp. 479 (S.D.N.Y.1968), is an example. There the defendant manufacturer conceived of using the infringing word in the retailers' advertising, paid for one half of their advertising costs, and entered into hold harmless agreements with some retailers as to their use of the word. The product's assembler too was held as an infringer where it was aware of, participated in, and aided a promotional campaign to use the infringing word.

But here there is no showing that defendants have conspired with the pharmacists or counseled or suggested that they disregard the doctors' orders. As mentioned above, for a New York pharmacist to mislabel would put him at risk of criminal and civil penalties and would subject him to the loss

of his license. Defendants' use of the blue and red colors, whatever its significance in assessing plaintiff's other claims, can hardly be deemed an invitation to the pharmacists to violate the penal law. A use of the same colors may make discovery of the offense less likely but it scarcely justifies holding defendants as accessories to the crime.

Before passage of the Lanham Act the doctrine of contributory trademark infringement went no further than to hold one who actively shared a retailer's infringement, as in the case, for example, of one who places the infringing label on the articles before delivering them to the retailer. *John B. Stetson Co. v. Stephen L. Stetson Co.*, 85 F.2d 586, 588 (2d Cir.), *cert. den.* 299 U.S. 605, 57 S.Ct. 232, 81 L.Ed. 446 (1936); *Andrew Jergens Co. v. Bonded Products Corp.*, 21 F.2d 419, 424 (2d Cir. 1927), *cert. den.* 275 U.S. 572, 48 S.Ct. 204, 72 L.Ed. 432 (1928); *Cuervo v. Jacob Henkell Co.*, 50 F. 471 (C.C.S.D.N.Y.1892). Nothing in the language or history of Section 32 intimates that it was intended to expand the doctrine to embrace the mere copying of features not the subject of a mark.

## IX

Plaintiff's other claim under the Lanham Act is based on Section 43(a), 15 U.S.C. § 1125(a), which provides in pertinent part that anyone who affixes to or uses in connection with any goods or container for goods "a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent" the goods, and causes them to enter commerce, shall be liable to a civil action by any person who believes he is or is likely to be damaged by the false description or representation.

Defendants' alleged false descriptions and representations are said to be of two kinds. First, plaintiff contends that defendants' advertisement of its cyclandelate as "comparable" or "equivalent" to "Cyclospasmol" is false. Second, plaintiff argues that the copying of its colors is an implied representation that the product comes from plaintiff.

The former contention has not been established by plaintiff. For purposes of the motion plaintiff has conceded that the two products have the same bioavailability and are bioequivalent. One would ordinarily suppose that to recite that a drug is "comparable" or "equivalent" to that of another is to convey the impression that its effect on the consumer is comparable or equivalent. Plaintiff submits no evidence that defendants' product is unsafe or affects patients differently from "Cyclospasmol".

█ Plaintiff nonetheless says that defendants may not call their product comparable or equivalent because they have not received approval from the Federal Food and Drug Administration ("FDA") to market their product whereas plaintiff has. Defendants claim that the FDA has informed them they do not need such approval. It is not clear to what extent plaintiff challenges this assertion, but, assuming the matter to be relevant at all (see § 307 of the Food, Drug and Cosmetic Act, 21 U.S.C. § 337, requiring proceedings to enforce the act to be brought in the name of the United States), at best an issue of fact would be raised as to whether defendants were required by the FDA to obtain approval.

The contention that defendants' use of the red and blue colors is a "false designation of origin" or a "false description or representation" within the meaning of Section 43(a) assumes that the colors have come to symbolize not only the product but also the producer (or at least the one who gives assurance of the product's quality.)[2] Plaintiff argues, in effect, that the colors are to be taken as representing to the patient "this will not only have the same therapeutic effect on you as Cyclospasmol, an Ives product, that you have been taking; it is in fact Ives' Cyclospasmol." Thus, says

2. Since 15 U.S.C. § 1060 permits an assignment of a registered mark provided the licensor supervises the licensee's use, *Dawn Donut Co. v.* *Hart's Food Stores, Inc.*, 267 F.2d 358, 366, 367 (2d Cir. 1959), a trademark may not necessarily symbolize the origin of the goods.

plaintiff, a use of the colors on a product equivalent to that of plaintiff but not made by it constitutes a misrepresentation though plaintiff has no patent and no trademark on the colors. It does not matter, of course, that no words articulated the alleged representation. Section 43(a) contemplates that "symbols" may falsely describe a product.

But this is not the typical "palming off" case where those who make the choice are said to be deceived. Here the patient ordinarily does not choose what drug to use or whether to buy a brand name or a generic drug. The doctors make that choice, and they are under no illusion that defendants' product is that of plaintiff. Consequently the significance to the consumers of the colors is not to symbolize the source of the goods so as to enable them to discriminate between competing producers. In the prescription drug context colors serve for the consumers other purposes of which plaintiff claims one should be to alert them to unscrupulous substitutions by pharmacists. Whatever "damage" plaintiff suffers occurs because defendants use colors not likely to arouse the consumers to an illegal substitution by the pharmacist. Plaintiff therefore contends that it is a "false representation" under Section 43(a) for anyone to color their capsules like those of plaintiff, and it should be granted exclusive use of red and blue.

In determining whether or to what extent Section 43(a) accords exclusive use of colors to a business *Sears, Roebuck & Co. v. Stiffel Company, supra,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and *Compco Corp. v. Day-Brite Lighting, Inc., supra,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), must be considered. Both involved state unfair competition laws which the lower courts had used to prevent copying of unpatented designs, in one case of a "pole lamp" and in the other of a fluorescent lighting reflector. As described above, the Supreme Court held that a state's unfair competition law could not, consistently with the implication of the patent laws, prohibit copying of the designs. In the *Sears* case the court described the limitations imposed on the power of the states in the following terms:

"Of course there could be 'confusion' as to who had manufactured these nearly identical articles. But mere inability of the public to tell two identical articles apart is not enough to support an injunction against copying or an award of damages for copying that which the federal patent laws permit to be copied. Doubtless a State may, in appropriate circumstances, require that goods, whether patented or unpatented, be labelled or that other precautionary steps be taken to prevent customers from being misled as to the source, just as it may protect businesses in the use of their trademarks, labels, or distinctive dress in the packaging of goods so as to prevent others, by imitating such markings, from misleading purchasers as to the source of the goods. But because of the federal patent laws a State may not, when the article is unpatented and uncopyrighted, prohibit the copying of the article itself or award damages for such copying." [Footnote omitted]

376 U.S. at 232–33, 84 S.Ct. at 789.

And in the *Compco Corp.* case the Court explained further:

"As we have said in *Sears,* while the federal patent laws prevent a State from prohibiting the copying and selling of unpatented articles, they do not stand in the way of state law, statutory or decisional, which requires those who make and sell copies to take precautions to identify their products as their own. A State of course has power to impose liability upon those who, knowing that the public is relying upon an original manufacturer's reputation for quality and integrity, deceive the public by palming off their copies as the original. That an article copied from an unpatented article could be made in some other way, that the design is 'nonfunctional' and not essential to the use of either article, that the configuration of the article copied may have a 'secondary meaning' which identifies the maker to the trade, or that there may be 'confusion' among purchasers as to which

article is which or as to who is the maker, may be relevant evidence in applying a State's law requiring such precautions as labeling; however, and regardless of the copier's motives, neither these facts nor any others can furnish a basis for imposing liability for or prohibiting the actual acts of copying and selling. Cf. *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 120, 59 S.Ct. 109, 114, 83 L.Ed. 73 (1938). And of course a State cannot hold a copier accountable in damages for failure to label or otherwise to identify his goods unless his failure is in violation of valid state statutory or decisional law requiring the copier to label or take other precautions to prevent confusion of customers as to the source of the goods." [Footnote omitted]

376 U.S. at 238–39, 84 S.Ct. at 782.

Both Supreme Court decisions dealt with the copying of physical designs, and the opinions make no mention of colors. But the means allowed to a state to prevent "palming off" were sharply restricted. Although the state could require labeling and prohibit imitation of a "marking" or "distinctive dress in the packaging of goods" so that purchasers would not be mislead as to the source, even a design's "nonfunctional" aspect which had acquired a "secondary meaning" could not be protected. It is thus hard to believe that the Supreme Court would consider that colors, or at least those not so fancifully or ingeniously arranged as to be eligible for registration as a trademark, can constitute a "label" or "marking" so as to qualify for the exclusive use of one business. Certainly the blue and red colors used by plaintiff cannot be deemed "distinctive dress in the packaging of goods". The capsules are not part of the "packaging". They are ingested by the patient and are the "goods" themselves. The language of the *Sears* and *Compco Corp.* cases, if taken at face value, thus appears to preclude any claim that defendants engaged in "unfair competition" by using capsules colored red and blue.

These decisions addressed themselves to the federal limitations on state unfair competition laws. So far as the opinions reveal, no consideration was given to whether Section 43(a) of the Lanham Act created a federal unfair competition law as to palming off broader than that permissible to the states. However, nothing in the Act's legislative history has been cited to this court and no policy is apparent suggesting that Congress had such an intention. The reasoning of the *Sears* and *Compco Corp.* cases would thus appear to be applicable to a Section 43(a) claim.

It is suggested that the quoted language from the *Sears* and *Compco Corp.* opinions is mere dictum which should not be followed in an action for unfair competition or for violation of Section 43(a) of the Lanham Act. Indeed, the Court of Appeals for the Eighth Circuit so held in a case brought under Section 43(a). *Truck Equipment Serv. Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1214–1215 (8th Cir.), *cert. den.*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976). There the defendant decided to enter into the hopper grain trailer market and copied plaintiff's design, portions of which the court found to be "nonfunctional" and to have acquired a "secondary meaning". Defendant also used in its sales promotion literature photographs of plaintiff's trailer. The court held that the use of the photographs constituted a "false designation of origin" within the meaning of Section 43(a). The court also appears to have held the sales of the trailers themselves to be violations of Section 43(a) because by copying the nonfunctional portion of the design defendants had misbranded their product as that of plaintiff. 536 F.2d at 1216. The court in interpreting Section 43(a) used the old tests of "unfair competition" which the *Sears* and *Compco Corp.* opinions had deemed impermissible, namely, whether features of the product were "nonfunctional", if so whether they had acquired a "secondary meaning", and whether their use by another was likely to cause "confusion" among purchasers.

No such restrictive reading of the two Supreme Court opinions has as yet been embraced in the Second Circuit. In *Bose*

*Corporation v. Linear Design Labs, Inc.,* 467 F.2d 304 (2d Cir. 1972), the court had before it a loudspeaker system of a unique pentagonal shape which plaintiff deliberately marketed without affixing its name, relying on the uniqueness of the product design to establish a common law trademark showing the product's origin as plaintiff. The defendant copied the design, and plaintiff claimed this was a false representation of origin under Section 43(a). The court left open the possibility that "product appearance, in its non-functional aspects, can support a holding under § 43(a) of the Lanham Act that the design functions as a[n] [unregistered] trademark to indicate origin, if it has acquired a secondary meaning[.]" 467 F.2d at 309. The court said it was unnecessary to decide whether this "purported simulation of trade dress" could give rise to a claim under Section 43(a). 467 F.2d at 310. *Cf. Sutton Cosmetics (P. R.) v. Lander Co.,* 455 F.2d 285 (2d Cir. 1972) (Section 43(a) prohibits deliberate copying of a competitor's trademark and packaging design for cosmetics).

Two years later, without referring to the *Bose* case, the Second Circuit read Section 43(a) as not going so far as to require "those who purvey goods to make affirmative disclosures about those goods where necessary to prevent the deception of the purchaser." *Alfred Dunhill Limited v. Interstate Cigar Company, Inc.,* 499 F.2d 232, 237, 238 (2d Cir. 1974). There Alfred Dunhill Limited sought to enjoin defendant from selling salvaged Dunhill brand tobacco under the Dunhill trademark without labelling it as subjected to possible water damage. The court held that there was no violation of Section 43(a), which "does not have boundless application as a remedy for unfair trade practices but is limited to false advertising as that term is generally understood." 499 F.2d at 237.

In the light of these two opinions it is at best uncertain whether a claim may be made in this circuit under Section 43(a) based on "trade dress" or whether the Court of Appeals for the Second Circuit would agree with the Eighth Circuit in considering the quoted language of the *Sears* and *Compco Corp.* cases as not binding. It is not necessary now to decide that question or to assess the considerations which led the Supreme Court opinions to abandon as unfruitful the distinction between "functional" and "nonfunctional" aspects of a product. For even if Section 43(a) be deemed to have enacted a federal law of "unfair competition" so as to prohibit the copying of a product's "nonfunctional" features which have acquired a "secondary meaning", plaintiff is not entitled to a preliminary injunction.

First, plaintiff has not established that the colors are "nonfunctional". Assuming they have no direct physical healing value, they serve purposes other than to identify plaintiff as the source. While we need not now consider the extent, if any, to which the use of a brand name during the life of a patent on a unique product causes that name to become generic and unprotectable when the patent expires, certainly the pale blue in which the 200mg. capsules of Cyclospasmol were sold during the patent period may, in the case of some patients, have come to symbolize not merely the source but also the drug itself and its therapeutic effects. The drug could be obtained only from plaintiff during the term of the patent, and to the extent that the blue color represents to the consumer the chemical ingredients which offer relief it would be an extension of the patent monopoly beyond its term to grant plaintiff the perpetual and exclusive use of the unpatented color.

The blue and red shades of the 400mg. capsules marketed first in 1975 have had a lesser time to acquire a symbolic therapeutic meaning to consumers. But here too there is no reason to suppose the colors have no function other than to identify plaintiff. Courts have never looked with favor on a demand to monopolize colors, *A. Leschen & Sons Rope Company v. Broderick & Bascom Rope Company,* 201 U.S. 166, 171-172, 26 S.Ct. 425, 50 L.Ed. 710 (1906), and the blue and red used by plaintiff are no less functional than the pink color which

the Second Circuit would not allow to be appropriated by the maker of "Pepto-Bismol". *Norwich Pharmacal Company v. Sterling Drug Co.,* 271 F.2d 569 (2d Cir. 1959). Here, as there, it is plausible to infer that the color may present "a pleasing appearance to the customer and to the sufferer." 271 F.2d at 572. In each case the consumer may associate the color with a beneficent effect. In any event it is fair to conclude, as defendants argue, that some patients may be fearful and offer resistance if their accustomed medication is dispensed in a different color.

Defendants argue that the colors have other functions, for example, to identify a drug in an emergency situation where an overdose is suspected. While this would plainly not be a preferred method of identification, perhaps in some situations it will be all that is immediately available, and to that extent the colors serve a practical purpose. Defendants also say that a patient may be taking several different drugs and may determine which ones to take and when by the colors. This hardly seems the most cautious way in which to take medication. But the law must recognize that individuals differ, and that to some the colors may be a signal and a protection.

Even assuming the colors to be "nonfunctional", plaintiff has not established that they have a "secondary meaning" identifying the product's source because of which consumers are moved to purchase. *Blisscraft of Hollywood v. United Plastics Co.,* 294 F.2d 694 (2d Cir. 1961).[3] Indeed, plaintiff has agreed not to rely on secondary meaning for purposes of the motion except to argue that defendants' copying in itself constitutes "evidence" of secondary meaning. No doubt copying of packaging can give rise to an inference that it has acquired a secondary meaning where no reasonable conclusion can be drawn oth-

er than that the defendant sought to pretend his goods were those of plaintiff's. *Scholl, Inc. v. Tops E.H.R. Corp.,* 185 U.S. P.Q. 754 (E.D.N.Y.1975). But no such conclusion is inevitable here. Defendants could reasonably have believed that the colors represented to the patient the therapeutic properties of cyclandelate.

Finally, this is a court of equity, cautioned to be wary of granting everlasting and unsupervised monopolies. It must consider the purpose which would be served by giving one business exclusive use of blue and red and must determine whether that end can be attained by means less drastic and more suited to a competitive economy.

As mentioned, plaintiff seeks to monopolize the colors in the hope the consumers will help identify dishonest druggists. No conclusive proof has been submitted as to the extent to which this would occur, though it may be assumed that some pharmacists with fraudulent intent would be deterred if differing colors were required.

But this is not the only method of policing pharmacists. Plaintiff and the State of New York are not without resources to identify, pursue and bring to justice pharmacists who are violating their duties. In preparation for this motion plaintiff has made test purchases in New York and other states to determine whether there have been illegal substitutions. Indeed, it appears that plaintiff has knowledge of drug stores that have a proclivity toward illegal substitution. Plaintiff can bring proceedings against them, as has been done in the case of Lowitt, and can also report the violations to the state authorities for criminal prosecution, for the collection of civil monetary penalties, and for proceedings to revoke the pharmacists' licenses. Successful efforts along these lines may well have the desired general deterrent effect.

---

**3.** Plaintiff argues that it can prevail without showing "secondary meaning" provided it can show "palming off". Doubtless where there is imitation of a trade name the use of the same colors might be "an intrinsic element" of the palming off. *Pro-phy-lac-tic Brush Co. v. Abraham & Straus,* 11 F.Supp. 660, 664 (E.D.N.Y.

1935). Where there is no copying of a trade name or the packaging but an unpatented feature of the product itself is sought to be monopolized that feature must at least have acquired a "secondary meaning". *Bose Corporation v. Linear Design, Labs, Inc., supra.*

In addition, the physicians, who have been the target of plaintiff's massive promotional campaigns and who as a group are not notoriously unsympathetic to the manufacturers of brand name drugs, have it in their power to alert their patients to look for the "Ives" imprint on the capsules.

Considering all these factors the court holds that on the present papers plaintiff has not shown a violation of Section 43(a).

## X

Little need be added concerning the "unfair competition" claim under New York law. The limitations imposed by the *Sears* and *Compco Corp.* opinions have already been discussed.

■ To the extent that New York is free to impose requirements to prevent customers from being misled as to the source of goods New York law appears to follow principles no more expansive than those adopted generally by federal and state courts. Moreover, the New York Education Law, by requiring a line on the prescription form permitting a druggist to substitute an appropriate lower priced drug, has manifested a positive policy to encourage legal substitutions and has thus added an additional consideration to the balance. For reasons already stated it is at least possible that giving plaintiff exclusive use of red and blue will inhibit legitimate substitutions which the New York legislature has found to be in the public interest.

Plaintiff has cited no authority persuasive that New York law entitles it to relief. *E. R. Squibb & Sons, Inc. v. Premo Pharmaceutical Labs, Inc.,* 195 U.S.P.Q. 545 (S.D.N.Y.1977), although it involved a prescription drug and applied New York law, concerned the imitation of the "get-up" of the manufacturer's packaging carton, which the pharmacist dispensed to the customer, and not a copying of the drug tablet itself. In *Marion Laboratories, Inc. v. Michigan Pharmacal Corp.,* 338 F.Supp. 762 (E.D. Mich.1972), *aff'd* without opinion 473 F.2d 910 (6th Cir. 1973), also a prescription drug case, the court applied the Michigan law of unfair competition, and held for the defend-

ant, finding it had not induced pharmacists to substitute.

*Merrell-National Laboratories v. Zenith Laboratories,* 194 U.S.P.Q. 157 (D.N.J.1977), appeal from injunctive order dismissed on procedural grounds, appeal from order denying motion for redetermination affirmed, 579 F.2d 786 (3rd Cir. 1978), is more directly in point. Applying New Jersey unfair competition law the court preliminarily enjoined the defendants from copying the physical appearance and colors of the plaintiff's prescription drug tablets. In that case the defendants did not submit factual affidavits opposing the preliminary injunction until they applied for "re-determination" of the motion. Only then did they set forth facts showing that the color and shape of the tablets had functional characteristics. Apparently the District Court denied redetermination in part because the belatedly offered facts had been known to the defendants when the original motion was made. The District Court opinion is therefore a dubious precedent. To the extent that its language is inconsistent with the result reached in the case at bar, this court respectfully disagrees.

Finally, plaintiff does not claim that Section 368–d of the New York General Business Law affords any broader support for its position than New York's common law of unfair competition. The Section provides in substance that likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be ground for injunctive relief in cases of infringement of a mark or unfair competition notwithstanding the absence of competition or confusion as to the source of the goods.

The section was apparently designed to permit injunctions in trademark, trade name and unfair competition cases where the defendant was engaged in a category of business different from that of plaintiff. *Cf. Federal Telephone & R. Corp. v. Federal Television Corp.,* 180 F.2d 250, 251, 252 (2d Cir. 1950). The language has apparently never been read to expand the law of unfair competition as applied to competitors.

## XI

Except for the claim of trademark infringement against Sherry, none of plaintiff's contentions has sufficient merit to warrant issuance of a preliminary injunction. Settle order.