601 F.2d 631
 202 U.S.P.Q. 548
 IVES LABORATORIES, INC., Plaintiff-Appellant,
v.
DARBY DRUG CO., INC., Inwood Laboratories Incorporated,
Lowitt Labs., Inc., MD Pharmaceutical Company, Inc., Premo
Pharmaceutical Laboratories, Inc., Rugby Laboratories, Inc.,
and Sherry Pharmaceutical Co., Inc., Defendants-Appellees.
 No. 529, Docket 78-7454.
 United States Court of Appeals,
Second Circuit.
 Argued May 2, 1979.
Decided June 11, 1979.
 
 Marie V. Driscoll, New York City (Rogers, Hoge & Hills, New York City, William F. Weigel, Charles J. Raubicheck, Egon E. Berg, and Steven Baron, New York City, of counsel), for plaintiff-appellant, Ives Laboratories, Inc.
 Robert V. Marrow, New York City (Salon, Bloustein & Raybin, Leon Salon, and Lauren Friedman, New York City, of counsel), for defendants-appellees, Darby Drug Co., Inc., MD Pharmaceutical Co., Inc., Rugby Laboratories, Inc., and Sherry Pharmaceutical Co., Inc.
 Sheldon S. Lustigman, New York City (Bass, Ullman & Lustigman, New York City), for defendant-appellee, Inwood Laboratories Inc.
 Peter T. Cobrin, New York City (Kirschstein, Kirschstein, Ottinger & Cobrin, P.C., New York City, David B. Kirschstein, New York City, of counsel), for defendant-appellee, Premo Pharmaceutical Laboratories, Inc.
 John H. Shenefield, Asst. Atty. Gen., U. S. Dept. of Justice, Washington, D.C., Barry Grossman, Roger B. Andewelt, Robert J. Wiggers, and Andrew L. Pringle, Attys., Dept. of Justice, Washington, D.C., of counsel), for the United States as amicus curiae.
 Before FRIENDLY and MULLIGAN, Circuit Judges, and GAGLIARDI, District Judge.*
 FRIENDLY, Circuit Judge:
 
 
 1
 This appeal from an order of the District Court for the Eastern District of New York denying a motion of plaintiff, Ives Laboratories, Inc., for a preliminary injunction, 455 F.Supp. 939 (1978), raises interesting questions of the application of Sears, Roebuck & Co. v. Stiffel Company, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) and Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), to the imitation of a peripheral vasodilator, dispensed only on a physician's prescription, once covered by a patent now expired and still covered by a registered trademark "Cyclospasmol". Although we find the case more difficult than did the district judge, we affirm the denial of a temporary injunction as within the discretion accorded to him.
 
 I.
 
 2
 Plaintiff Ives Laboratories, Inc. (Ives) manufactures and sells Cyclospasmol to wholesalers, retail pharmacists, and hospitals. The drug, a powder whose generic name is cyclandelate, is sold in two kinds of labeled packages. One type of package is filled with pale blue capsules imprinted "Ives 4124", each containing a dosage of 200 mg. The other is filled with red-and-blue capsules imprinted "Ives 4148", each containing a dosage of 400 mg. The blue capsule had been used during the life of the patent; the blue-and-red capsule was introduced after its expiration.
 
 
 3
 Ives directs its advertising not to the consumer but to prescribing physicians and to pharmacists in hospitals and elsewhere. Until April 26, 1972, when the patent expired, the primary object of the advertising (which included the large-scale distribution of "starter" samples) was to convince the physician of the superiority of Cyclospasmol over other vasodilators; since then the advertising has had the additional objective of persuading the physician to specify Cyclospasmol rather than writing prescriptions which can be filled with competing cyclandelate preparations. The latter objective has assumed increased importance because of the enactment of "generic drug laws" by many states.[1]
 
 
 4
 Defendants Premo Pharmaceutical Laboratories, Inc. (Premo), Inwood Laboratories, Incorporated (Inwood), and MD Pharmaceutical Company, Inc. (MD), (collectively the manufacturers), purchase empty capsules which they fill with the cyclandelate powder and sell the capsules to wholesalers, hospitals, retail pharmacies and others. Premo and Inwood manufacture and sell both 200 mg. and 400 mg. capsules in colors essentially identical to Ives'; MD has done the same with 200 mg. capsules. Until shortly before the district court's decision, none imprinted any mark on their capsules; on June 26, 1978, Premo filed an affidavit stating that in the future it would imprint "Premo" on all its capsules. Three other defendants, Darby Drug Co., Inc. (Darby); Rugby Laboratories, Inc. (Rugby); and Sherry Pharmaceutical Co., Inc. (Sherry), (collectively "the wholesalers") purchase capsules of the sort described and resell them to other wholesalers, doctors, pharmacies and others. Both categories of defendants promote the generic product as "comparable" or "similar" or "equivalent" to Cyclospasmol; in some catalogs they refer to the color of the capsules.[2] Defendants' advertising, like plaintiff's, is directed to physicians, pharmacists, and other intermediaries, and not to the ultimate consumer. Ives conceded for the purpose of the temporary injunction motion that the cyclandelate used by defendants had the same therapeutic properties as that used in Cyclospasmol.
 
 
 5
 The complaint claimed that defendants' use of capsules having the same color or colors as those previously adopted by Ives violated its rights in three ways:
 
 
 6
 (1) as contributory infringements in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114, in that the similarity encouraged retail druggists to use Ives' mark "Cyclospasmol" in selling capsules not manufactured by it;
 
 
 7
 (2) as "a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent" the goods sold by defendants in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);[3]
 
 
 8
 (3) as unfair competition under New York common and statutory law, N.Y. General Business Law § 368-d.
 
 
 9
 In a considered opinion, 455 F.Supp. 939, Judge Nickerson found that there was no sufficient evidence that defendants had been encouraging, as distinguished from merely facilitating, druggists in using Ives' mark in prescriptions filled with generic cyclandelate, and that the other claims were probably invalid, either because of the "general" law of trademarks and unfair competition or as contravening Sears and Compco. In his view, therefore, "none of plaintiff's contentions has sufficient merit to warrant issuance of a preliminary injunction." Id. at 952.[4]
 
 
 10
 Ives' complaint related to a wide spectrum of acts. In a state with a generic drug law like New York's these range from the most serious case, where the physician has specified Cyclospasmol and the druggist has filled the prescription with the generic product but has labeled it "Cyclospasmol" admittedly actionable against the druggist to the most innocent one, where the physician has permitted substitution and the druggist has filled the prescription with capsules of the competing manufacturer and so labeled the package. Intermediate cases are where the prescription requires Cyclospasmol and the druggist substitutes a product of the defendants naming it or not, and where the prescription permits substitution and the druggist fills it with defendant's product but names it Cyclospasmol (again clearly actionable against the druggist) or gives no name at all.[5] Similar variations can occur in other states with or without generic drug laws.
 
 II.
 
 11
 It will be useful to discuss at the outset plaintiff's claim of contributory infringement in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114. The judge was right in concluding that the protection conferred by that section is narrower than that afforded by § 43(a), 15 U.S.C. § 1125(a), in that the former relates only to infringement of the trademark itself and thus would apply only to cases where Ives' mark or a confusingly similar one had been used. We fear, however, that his approach to the issue may have been unduly narrow. He referred to "the knowing and deliberate instigation of such a practice", 455 F.Supp. at 945, and said that before "passage of the Lanham Act the doctrine of contributory trademark infringement went no further than to hold one who actively shared a retailer's infringement, as in the case, for example, of one who places the infringing label on the articles before delivering them to the retailer." Id. at 946, citing cases. While such cases would surely constitute contributory infringement, they do not mark the limits of the doctrine. The authorities later reviewed indicate to us that a manufacturer or wholesaler would be liable under § 32 if he suggested, even if only by implication, that a retailer fill a bottle with the generic capsules and apply Ives' mark to the label, or continued to sell capsules containing the generic drug which facilitated this to a druggist whom he knew or had reason to know was engaging in the practices just described. The proper criteria are stated in Coca-Cola Co. v. Snow Crest Beverages, Inc., 64 F.Supp. 980, 989 (D.Mass.1946) (Wyzanski, J.), affd., 162 F.2d 280 (1 Cir.), Cert. denied, 332 U.S. 809, 68 S.Ct. 110, 92 L.Ed. 386 (1947). As will be shown below, nothing in Sears or Compco allows such practices. If the judge considered a narrower view of the doctrine of contributory infringement to be warranted because mislabeling by a New York pharmacist "would put him at risk of criminal and civil penalties and would subject him to the loss of his license" and thought that defendants would be liable for contributory infringement only if they could be held "as accessories to the crime", 455 F.Supp. at 945-46, he was in error. New York's provision of additional sanctions for confusing consumers by infringement of a trademark cannot limit the rights bestowed by federal law. However, the court was justified in concluding that Ives failed to adduce the quantum of proof necessary to require issuance of a temporary injunction for contributory infringement even on what we deem the proper standard of liability under § 32. Ives' proof was limited to 15 instances of improper substitution and defendants conceded only that the identity of color made this easier if a druggist were so inclined.III.
 
 
 12
 Before considering Ives' other claims, it will be useful to review what we regard as the most pertinent authorities.
 
 
 13
 We begin with two opinions of the Supreme Court. William R. Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161 (1924), was a prescription drug case with facts close to those here.[6] Lilly had begun and continued to make and sell an unpatented prescription liquid preparation of quinine in combination with other substances, including yerba-santa and chocolate, under the name of Coco-Quinine. Predecessors of Warner later marketed a similar preparation under the name of Quin-Coco. Lilly sued for trademark infringement and unfair competition. The Court agreed with the two lower courts in dismissing the claim of trademark infringement on the ground that both names were descriptive. On the issue of unfair competition the Court held that Lilly had no right to prevent Warner from manufacturing and selling a product exactly like Coco-Quinine. That, however, was far from ending the case. The Court mentioned with disapproval that some of Warner's salesmen "suggested that, without danger of detection, prescriptions and orders for Coco-Quinine could be filled by substituting Quin-Coco" and that "(m)ore often . . . the feasibility of such a course was brought to the mind of the druggist by pointing out the identity of the two preparations and the enhanced profit to be made by selling Quin-Coco because of its lower price." 265 U.S. at 530, 44 S.Ct. at 617. "That no deception was practiced on the retail dealers, and that they knew exactly what they were getting, is of no consequence. The wrong was in designedly enabling the dealers to palm off the preparation as that of the respondent." Id. While Lilly was not entitled to the injunction granted by the court of appeals which enjoined Warner from the use of chocolate, it was entitled to "effective relief". This should include not only prohibition of acts such as those above recited but also a requirement that the packages sold the druggists "shall not only bear labels clearly distinguishing petitioner's (Warner's) bottled product from the bottled product of respondent (Lilly), but that these labels shall state affirmatively that the preparation is not to be sold or dispensed as Coco-Quinine or be used in filling prescriptions or orders calling for the latter." 265 U.S. at 532-33, 44 S.Ct. at 618.
 
 
 14
 The second case, Kellogg Company v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938),[7] related to shredded wheat. The product had been originated by National's predecessor, one Perky, who had obtained a patent on the machine used in its manufacture. National marketed the product, in a pillow-shaped form, under the name of Shredded Wheat in packages picturing a dish containing two biscuits submerged in milk. Kellogg manufactured and sold a similar product under the same name, shredded wheat. After procedural complications unnecessary to detail, the Court of Appeals for the Third Circuit directed the district court to enter a decree, 96 F.2d 873 (1938), enjoining Kellogg:
 
 
 15
 "(1) from the use of the name 'SHREDDED WHEAT' as its trade name, (2) from advertising or offering for sale its product in the form and shape of plaintiff's biscuit, and (3) from doing either."
 
 
 16
 305 U.S. at 115, 59 S.Ct. at 112.
 
 
 17
 In reversing, the Supreme Court began by holding that National had no exclusive right to Shredded Wheat as a trade name both because the term was generic and because the name "as well as the product, the process and the machinery employed in making it, has been dedicated to the public" upon the expiration of Perky's patent in 1912 or shortly thereafter. Because National had allowed Shredded Wheat to become "the generic designation of the thing which has arisen during the (patent) monopoly," Singer Mfg. Co. v. June Mfg. Co., 163 U.S. 169, 185, 16 S.Ct. 1002, 1008, 41 L.Ed. 118 (1896), it would in effect extend the patent monopoly if National were to be given exclusive rights in the name.
 
 
 18
 The Court next held that National "has not the exclusive right to sell shredded wheat in the form of a pillow-shaped biscuit . . . ." This was primarily because the pillow shape was that in which shredded wheat was made under the patent. Here again Kellogg "was free to use the pillow-shaped form, subject only to the obligation to identify its product lest it be mistaken for that of the plaintiff." 305 U.S. at 120, 59 S.Ct. at 114.
 
 
 19
 Finally the Court addressed itself to the question whether Kellogg was exercising its rights "fairly", i. e., "in a manner which reasonably distinguishes its product from that of plaintiff." It found that Kellogg had taken every reasonable means for doing this using cartons distinctive in size, form and color, featuring the name Kellogg, and containing biscuits only two-thirds the size of National's. Conceding that Kellogg was sharing in the good-will of an article created by National and its predecessors, Mr. Justice Brandeis said that "(s)haring in the goodwill of an article unprotected by patent or trade-mark is the exercise of a right possessed by all and in the free exercise of which the consuming public is deeply interested." 305 U.S. at 122, 59 S.Ct. at 115.
 
 
 20
 There is something for everyone in these two decisions. Defendants take comfort from so much of Warner as upheld that company's right to copy not only the basic ingredients of Lilly's product but their color, taste and smell; plaintiff emphasizes the severe restrictions placed on Warner in order to avoid dishonest substitution by druggists. Defendants find cheer in the holdings in Kellogg that National, in part because of expiration of the patent, had no rights in the name Shredded Wheat or in the pillow-shaped form. Plaintiff says that the holding as to the name was based on its generic nature; that the Court differentiated the case of a valid trademark; that the holding as to the pillow-shaped form likewise was predicated on the bases that this was what the patented machine was designed to produce and that the form was also covered by a design patent that had been held invalid and in any event had long since expired; and that, even on the premise that neither the name nor the form deserved protection, the Court still insisted on Kellogg's doing everything reasonably possible to disclose the difference in source. It argues that here in contrast, so far as the ultimate consumer is concerned, the defendants did nothing (except for Premo's recent imprinting) to disclose the difference to the consumer, although the use of other colors was entirely feasible.
 
 
 21
 We turn next to a few particularly pertinent decisions of courts of appeals in the interval between Kellogg and Sears-Compco one before and the others after the effective date of the Lanham Act. Smith, Kline & French Laboratories v. Clark & Clark, 157 F.2d 725 (3 Cir.), Cert. denied, 329 U.S. 796, 67 S.Ct. 482, 91 L.Ed. 681 (1946), involved both patent and unfair competition claims relating to amphetamine sulphate tablets, a prescription drug. The court found that the shape, color and scoring of the tablets were functional. Partially reversing a decree perpetually enjoining Clark & Clark from manufacturing or selling these, the court held that SKF was entitled to such an injunction only during its patent monopoly and thereafter "to a decree enjoining the palming off of the defendants' product for that of SKF." This should include "(a) provision requiring the defendants to stamp their tablets with the initials C & C or some other distinguishing mark . . ." (footnote omitted), 157 F.2d at 731.[8]
 
 
 22
 Upjohn Company v. Schwartz, 246 F.2d 254 (2 Cir. 1957), also has some factual resemblance to this case. The portion of the opinion here relevant is that dealing with the prescription trade in various unpatented tablets marketed by Upjohn under differing trade names. There was evidence that two of defendant's salesmen had distributed cards, apparently quite similar to the catalogs in this case, containing a list of defendant's products with a space alongside each on which the names of similar products manufactured by Upjohn had been filled in and had suggested substitution. This court held that such action constituted unfair competition in violation of New York law even though Upjohn had not established secondary meaning and there was no proof of actual substitution. We directed, 246 F.2d at 262, that defendant:
 
 
 23
 should be enjoined from either directly or indirectly, representing or suggesting to any one selling any pharmaceutical products similar in contents and appearance to plaintiff's products that such similar products may be substituted for the products of the plaintiff when the latter are prescribed or requested by a physician; and that on the sale of any such products he be required to attach to bottles or containers of a size not made for direct over-the-counter sale, a notice that the contents are not to be sold or dispensed as the product of the plaintiff.
 
 
 24
 Norwich Pharmacal Co. v. Sterling Drug, Inc., 271 F.2d 569 (2 Cir. 1959), Cert. denied, 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739 (1960), although heavily relied on by defendants for its statement "(t)hat a color may become someone's exclusive property as a perpetual monopoly in connection with a specific product has been rejected by the courts throughout the years", 271 F.2d at 572, is not of so much assistance to them as they claim. The case dealt with preparations sold in the manufacturers' bottles over-the-counter. The court held that where defendant's product differed in name, container shape and label, copying of the pink color of plaintiff's liquid was not unfair competition in the absence of proof of secondary meaning or "such practices as constitute palming off, actual deception or appropriation of another's property." 271 F.2d at 571. The court cited Upjohn Co. v. Schwartz, supra, as an instance of palming off. Id.
 
 
 25
 This brings us to Sears and Compco, supra, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 and 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669. Their precise holding was that a state may not confer protection under its law of unfair competition against the retail sale of articles which were copied from others manufactured under invalid design patents (in Sears also under an invalid mechanical patent), simply because of confusion or likelihood of confusion.[9] There is no indication that either Stiffel's lamps or Day-Brite's reflectors were trademarked, although the lamps bore Stiffel tags and the fixtures of which the reflectors were a part were identified by a catalog number. The Sears lamps were sold at retail without identifying tags (although the cartons containing them were marked) and there was some evidence of actual confusion, 376 U.S. at 226-27, 84 S.Ct. 784. On the other hand the Court found "considerable evidence of the care taken by Compco to prevent customer confusion, including clearly labeling both the fixtures and the containers in which they were shipped and not selling through manufacturers' representatives who handled competing lines." 376 U.S. at 237, 84 S.Ct. at 781. The holdings clearly apply to goods covered by an expired patent with the same force (or arguably even more, see Brown, Product Simulation, 64 Colum.L.Rev. 1216, 1218-19 (1964)), as to an invalid patent.
 
 
 26
 It has been said that if the lower courts in Sears and Compco had rested their decisions on "general" principles of unfair competition law rather than on the law of Illinois, the Supreme Court would not have needed more than a citation of Kellogg to justify reversal. Brown, Product Simulation, Supra, at 1216. It was this probably unwarranted reliance, see 376 U.S. at 227 n. 2, 84 S.Ct. 784, that led the Court to take a constitutional ground preemption by federal patent law and then to explain how far the preemption extended. The explanation was made in two passages that have been subjected to minute scrutiny:
 
 
 27
 Sears has been held liable here for unfair competition because of a finding of likelihood of confusion based only on the fact that Sears' lamp was copied from Stiffel's unpatented lamp and that consequently the two looked exactly alike. Of course there could be "confusion" as to who had manufactured these nearly identical articles. But mere inability of the public to tell two identical articles apart is not enough to support an injunction against copying or an award of damages for copying that which the federal patent laws permit to be copied. Doubtless a State may, in appropriate circumstances, require that goods, whether patented or unpatented, be labeled or that other precautionary steps be taken to prevent customers from being misled as to the source, just as it may protect businesses in the use of their trademarks, labels, or distinctive dress in the packaging of goods so as to prevent others, by imitiating such markings, from misleading purchasers as to the source of the goods. 9 But because of the federal patent laws a State may not, when the article is unpatented and uncopyrighted, prohibit the copying of the article itself or award damages for such copying.
 
 
 28
 Sears, 376 U.S. at 232-33, 84 S.Ct. at 789.
 
 
 29
 As we have said in Sears, while the federal patent laws prevent a State from prohibiting the copying and selling of unpatented articles, they do not stand in the way of state law, statutory or decisional, which requires those who make and sell copies to take precautions to identify their products as their own. A State of course has power to impose liability upon those who, knowing that the public is relying upon an original manufacturer's reputation for quality and integrity, deceive the public by palming off their copies as the original. That an article copied from an unpatented article could be made in some other way, that the design is "nonfunctional" and not essential to the use of either article, that the configuration of the article copied may have a "secondary meaning" which identifies the maker to the trade, or that there may be "confusion" among purchasers as to which article is which or as to who is the maker, may be relevant evidence in applying a State's law requiring such precautions as labeling; however, and regardless of the copier's motives, neither these facts nor any others can furnish a basis for imposing liability for or prohibiting the actual acts of copying and selling.
 
 
 30
 Compco, 376 U.S. at 238, 84 S.Ct. at 782.
 
 
 31
 Some, including dissenting Justices, have thought the basic principles of Sears and Compco were undermined by Goldstein v. California, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973) (sustaining California law affording state copyright protection for subject not eligible under the applicable federal copyright law), and Kewanee Oil Corp. v. Bicron Corp., 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974) (sustaining validity of state trade secret common law). See, e. g., Dannay, The Sears-Compco Doctrine Today; Trademarks and Unfair Competition, 67 Trademark Rep. 132 (1977); The Supreme Court, 1972 Term, 87 Harv.L.Rev. 1, 282 (1973); Zammet, The Ghost of Sears-Compco is Finally Laid to Rest (Or Is It?), 3 Hofstra L.Rev. 37 (1975). However, the majority in both cases disclaimed any intention to depart from Sears and Compco.
 
 
 32
 Only a few cases have dealt with the effect of Sears and Compco on simulation of the color of a trademarked drug. Marion Laboratories, Inc. v. Michigan Pharmacal Corp., 338 F.Supp. 762, 769-70 (E.D.Mich.1972), aff'd without opinion, 473 F.2d 910 (6 Cir. 1973), assumed that the protection afforded by Smith, Kline & French Laboratories v. Clark & Clark, supra, 157 F.2d 725, and Upjohn Co. v. Schwartz, 246 F.2d 254, had survived Sears and Compco but denied relief for inadequacy of proof of either actual or suggested substitution or secondary meaning. In Merrell-National Laboratories, Inc. v. Zenith Laboratories, Inc., 194 U.S.P.Q. 157 (D.N.J.1977), on facts quite similar to those here, the court issued a preliminary injunction against manufacturers because of "the mere fact that they sold and distributed to the defendant pharmacies an instrumentality of trade which could be passed off as plaintiff's products." Although the Third Circuit affirmed, 579 F.2d 786 (1978), it noted that only after the district court's decision had the manufacturer submitted factual affidavits challenging plaintiff's allegations of unlawful substitution, claiming that these were authorized under New Jersey's generic drug law, and attempting to show a functional basis for the copying; the affirmance was explicitly limited to a holding that the denial of a motion to redetermine the preliminary injunction on the basis of this new, and contradicted, material was not an abuse of discretion.[10] Quite recently the decision here under review was followed in Boehringer Ingelheim G. m. b. H. v. Premo Pharmaceutical Laboratories, Inc., D.N.J., No. 79-738, decided March 15, 1979, where there was no proof of secondary meaning or illegal substitution.
 
 IV.
 
 33
 Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)[11] goes beyond § 32 in making certain types of unfair competition federal statutory torts, whether or not they involve infringement of a registered trademark. L'Aiglon Apparel, Inc. v. Lana Labell, Inc., 214 F.2d 649 (3 Cir. 1954); Federal-Mogul-Bower Bearings, Inc. v. Azoff, 313 F.2d 405 (6 Cir. 1963). On the other hand, as was said in an early case under the statute, § 43(a) "should be construed to include only such false descriptions or representations as are of substantially the same economic nature as those which involve infringement or other improper use of trade-marks. It should not be interpreted so as to bring within its scope any kind of undesirable business practice which involves deception, when such practices are outside the field of the trade-mark laws." Samson Crane Co. v. Union National Sales, Inc., 87 F.Supp. 218, 222 (D.Mass.1949), aff'd per curiam, 180 F.2d 896 (1 Cir. 1950). In this circuit Judge Herlands said much the same in an opinion subsequent to Sears and Compco, Geisel v. Poynter Products, Inc., 283 F.Supp. 261, 266-68 (S.D.N.Y.1968). Ives' claim is that, under the circumstances of this case the distinctive color of its capsules is entitled to protection under § 43(a) and that Sears and Compco were not intended to limit rights accorded by another federal statute.
 
 
 34
 It is surely true that in the Sears and Compco opinions the Supreme Court said nothing about the federal tort created by § 43(a).[12] Stiffel's and Day-Brite's claims were treated as resting solely on state unfair competition law which was held invalid as in conflict with federal patent law. The opinions can be read as limited to rights claimed under state unfair competition law granting protection equivalent to that of the federal patent or copyright laws for products not enjoying valid patent or copyright protection. The Court, it can be strongly argued, had no need to be concerned with marking out the boundaries of a federal tort over which it had complete control and which Congress could contract if the courts were pressing it further than that body desired.[13] The Eighth Circuit took essentially this position in Truck Equipment Service Co. v. Fruehauf Corp., 536 F.2d 1210, 1214-15, Cert. denied, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976). The court there sustained a claim under § 43(a) for copying the exterior design of a hopper grain trailer which was found to be nonfunctional and to have acquired a secondary meaning.[14] While we previously left this question open in Bose Corp. v. Linear Design Labs, Inc., 467 F.2d 304, 309-10 (1972), we are now prepared to agree with the Eighth Circuit.
 
 
 35
 Assuming that the law developed by federal courts under § 43(a) prior to Sears and Compco continues to govern and that the precise strictures there addressed to the states may not be applicable to a claim under that section, this still leaves the question whether Ives showed a probability of success or a fair ground for litigation and a balance of hardships tipping decidedly in its favor. A good statement of the law under § 43(a) is in Pagliero v. Wallace China Co., 198 F.2d 339, 343 (9 Cir. 1952), quoted in Bliss v. Gotham Industries, Inc., 316 F.2d 848, 855 (9 Cir. 1963), on which the Eighth Circuit relied in the Truck Equipment case:
 
 
 36
 Imitation of the physical details and designs of a competitor's product may be actionable, if the particular features imitated are 'non-functional' and have acquired a secondary meaning. Crescent Tool Co. v. Kilborn & Bishop Co., 2 Cir., 1917, 247 F. 299. But, where the features are 'functional' there is normally no right to relief. 'Functional' in this sense might be said to connote other than a trade-mark purpose. If the particular feature is an important ingredient in the commercial success of the product, the interest in free competition permits its imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demands in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made. Under such circumstances, since effective competition may be undertaken without imitation, the law grants protection.
 
 
 37
 One would not initially suppose the color of a capsule to be functional. Unlike the chocolate in the Warner case, Supra, the blue and blue-and-red coatings of Ives' capsules do not contribute to their efficacy; any other colors would do as well.[15] The argument that, like functional elements, color ought to be automatically denied protection because of the risk of creating monopolies through tying up all available colors, cf. Morrissey v. Proctor & Gamble Co., 379 F.2d 675 (1 Cir. 1967), does not seem persuasive; the evidence showed that, in addition to the other primary colors, an endless number of color combinations was available to the defendants. The case for functionality thus depends on the evidence proffered by defendants that copying whatever colors Ives had chosen served a number of utilitarian purposes, see 455 F.Supp. at 949-50, essential to effective competition. At this stage of the case we need not go beyond saying that the judge was warranted in considering this to be fairly arguable.
 
 
 38
 With respect to secondary meaning we cannot say that Ives would necessarily be unable to establish that consumers had come to associate the blue and blue-and-red colors with the trademark Cyclospasmol. Mr. Justice Holmes said long ago, American Waltham Watch Co. v. United States Watch Co., 173 Mass. 85, 87, 53 N.E. 141, 142 (1899):
 
 
 39
 It is true that a man cannot appropriate a geographical name; but neither can he a color, or any part of the English language, or even a proper name to the exclusion of others whose names are like his. Yet a color in connection with a sufficiently complex combination of other things may be recognized as saying so circumstantially that the defendant's goods are the plaintiff's as to pass the injunction line.
 
 
 40
 It is significant that, given the method of sale, Ives had no way of identifying Cyclospasmol to the ultimate consumer other than by the color of the capsule and by the imprint on it, which is contended to be of dubious value. See Note, Unfair Competition and the Doctrine of Functionality, 64 Colum.L.Rev. 544, 557-58 and nn. 93 & 94 (1964). This distinguishes the case from Norwich Pharmacal Co. v. Sterling Drug, Inc., supra, 271 F.2d 569, where differences in name, labelling and packaging seen by the consumer were such that the court thought "it stretches credulity to imagine a purchaser confusing these disparate articles." 271 F.2d at 571. Also the fact that the association was due to Ives' having been the exclusive source of cyclandelate during the patent period does not deprive Ives of an opportunity to show that a non-functional configuration or trade dress had developed secondary meaning, see, e. g., Mine Safety Appliances Co. v. Electric Storage Battery Co., 405 F.2d 901, 902 n. 2, 56 CCPA 863 (1969); Application of Mogen David Wine Corp., 328 F.2d 925, 51 CCPA 1260 (1964) and 372 F.2d 539, 54 CCPA 1086 (1967), and we see no basis in principle for saying that simply because the colored capsule is ingested, the color cannot constitute "trade dress". However, plaintiff "agreed not to rely on secondary meaning for purposes of the motion except to argue that defendants' copying in itself constitutes 'evidence' of secondary meaning." 455 F.Supp. at 950.
 
 
 41
 We find rather less merit in plaintiff's claims under New York law than in those under § 43(a) of the Lanham Act. It is true that we have recognized the breadth of the relief which New York affords against unfair competition, Flexitized Inc. v. National Flexitized Corp., 335 F.2d 774, 781-82 (2 Cir. 1964), Cert. denied 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965), and there took a rather limited view of the extent to which the then recent Sears decision had interfered with this, 335 F.2d at 781 n. 4. Apart from the question whether the Flexitized footnote adequately recognized the blow dealt by Sears and Compco to state unfair competition laws, "New York law" now includes it generic drug law, Education Law §§ 6810-6826, and we do not know how New York will strike the balance between unfair competition claims of manufacturers of branded drugs and the policy of generic drug laws facilitating substitution when the physician has authorized this. On this aspect of the case, defendants' claims that patients would be put off in accepting substitution by a change from the familiar colors, if factually established, see Swenson, Property Rights in the Color and Shapes of Capsules, 32 Food, Drug & Cosm.L.J. 361, 367-68 (1977),[16] would be especially pertinent. Whether plaintiff would be entitled to relief under the unfair competition law of other states, particularly those without generic drug laws, is not before us.
 
 
 42
 The upshot of our consideration is that while we are not so convinced that Sears and Compco are an insurmountable barrier to plaintiff as was the district judge and, indeed, believe them to have only tangential bearing on the Lanham Act claims, this is an appropriate case for applying the "rule" that denial of a temporary injunction should not be reversed save for "abuse" of discretion. State of New York v. Nuclear Regulatory Commission, 550 F.2d 745, 750-53 (2 Cir. 1977) and cases there cited. Although some depositions were taken, the motion was heard largely on affidavits. As noted above, the evidence of improper substitution was limited to 15 prescriptions.[17] Discovery and trial might show that the practice was much more widespread or, on the other hand, as defendants suggest, that the pharmacies in question were known bad actors and few others engaged in such practices. Although plaintiff doubtless made the required minimal showing of "irreparable injury", namely, that if it is entitled to a final injunction, its interim damages cannot be calculated with sufficient accuracy to make damages an adequate substitute, see Buffalo Courier-Express Inc. v. Buffalo Evening News, Inc., 60 F.2d 48, 58 - 59 (2 Cir.1979), there is no showing that its business will be seriously imperiled in the interval before a decision can be rendered after a trial; on the other hand, the issuance of a preliminary injunction would clearly have wreaked serious harm on the defendants. In sum, we cannot say that Ives sufficiently demonstrated probability of success for the broad injunction that it demanded and, while it did tender issues affording a fair ground for litigation, the balance of hardships did not tip decidedly in its favor, see note 4, Supra.
 
 
 43
 The order is therefore affirmed. After trial the district court will, of course, consider whether even if under our analysis Ives is not entitled to the full relief demanded, it should not be awarded more limited relief of the sort granted in Warner, Kellogg and other cases.
 
 
 
 *
 Judge of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 The New York law, Education Law § 6810(6)(a), requires the prescription form to state:
 This prescription will be filled generically unless physician signs on line stating "dispense as written."
 The form must contain two lines, one over the words "substitution permissible" and the other over the words "dispense as written"; the physician must sign one or the other. If the physician signs the "substitution permissible" line, substitution is mandatory if the drug is on a list established under the New York Health Law, see N.Y. Education Law § 6816-a, N.Y. Public Health Laws § 206(1)(i); in other cases substitution of the generic drug is permissible. Unless the physician otherwise directs, the pharmacist making a substitution must indicate on the label the name and strength of the drug and its manufacturer; when a brand name is dispensed, the pharmacist, unless otherwise directed by the prescription, must similarly affix on the label the brand name and strength. N.Y. Education Law § 6816-a.
 
 
 [2]
 Sherry had offered the drug under the name "Spasmol" but had abandoned such use. The district court enjoined resumption of the practice, and Sherry has not appealed. Plaintiff had also named an additional defendant, Lowitt Labs., Inc. (Lowitt), a retail pharmacy; the complaint charged that, on receiving a prescription for Cyclospasmol, Lowitt substituted generic cyclandelate and labeled the bottle "Cyclospasmol." The court entered a consent order prohibiting this
 
 
 [3]
 In the trial court this claim included a contention that the product sold by defendants was not "comparable" or "equivalent" to Cyclospasmol. The judge held this claim not to have been proved, 455 F.Supp. at 946, and the contention has not been pressed on this appeal from the denial of a temporary injunction
 
 
 [4]
 The judge referred to our formulation of the criterion for this in Selchow & Righter Co. v. McGraw-Hill Book Company, 580 F.2d 25, 27 (2d Cir. 1978). Since we think it clear that Ives showed "irreparable injury" at least in the sense of impracticability of establishing the amount of damages, we must assume that the judge concluded that there was no probability of success on the merits and Either that the questions raised by plaintiff were not sufficiently serious to make them a fair ground for litigation Or that the balance of hardships did not tip decidedly in its favor
 
 
 [5]
 While many of these variations are actionable as misbranding under the New York law, see N.Y. Education Law §§ 6811(9), 6815(2)(h), 6816, these laws, aimed at protecting the consumer, do not necessarily displace the protection for competitors embodied in trademark and unfair competition law
 
 
 [6]
 Although the opinion does not say so, the Court apparently applied its own views of trademark and unfair competition law under the principle of Swift v. Tyson, 41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842)
 
 
 [7]
 Mr. Justice Brandeis noted, 305 U.S. at 113 n. 1, 59 S.Ct. at 111, that "(m)ost of the issues in the case involve questions of common law and hence are within the scope of Erie R. Co. v. Tompkins, (1938) 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. But no claim has been made that the local law is any different from the general law on the subject, and both parties have relied almost entirely on federal precedents."
 
 
 [8]
 Previous discussion in the opinion indicated that the injunction should also include a prohibition against defendant's salesmen pointing out the feasibility of substituting defendant's product for SKF's without danger of detection, 157 F.2d at 731
 Smith, Kline & French Laboratories v. Heart Pharmaceutical Corp., 90 F.Supp. 976 (S.D.N.Y.1950), citing Clark & Clark, accorded broader relief. The case related to two prescription drugs, Benzedrine (amphetamine sulphate) and Dexedrine (dextroamphetamine sulphate). Plaintiff decided to market these in a new and distinctive heart shape, colored orange for Dexedrine and brown for Benzedrine. Defendant sent postcards to druggists offering to sell the generic drugs in tablets which were exact replicas of plaintiff's; imprinted on the pictorial representations of the tablets was the notation "Color Guaranteed". A later mailing added the words "orange" and "tan". Finding that the shape and color were non-functional and that SKF's advertising had endowed them with secondary meaning, the court entered a temporary injunction restraining defendant from marketing the generic drugs "in tablets having the combination of shape and colors of plaintiff's products or in any other shape and colors so closely resembling the combination of shape and colors of plaintiff's products as to be likely to enable druggists to palm off defendants' products as plaintiff's products."
 
 
 [9]
 In Compco, 376 U.S. at 238, 84 S.Ct. at 782, the Court accepted the somewhat dubious finding of the trial court "that the configuration of Day-Brite's fixture identified Day-Brite to the trade because the arrangement of the ribbing had, like a trademark, acquired a 'secondary meaning' by which that particular design was associated with Day-Brite."
 
 
 [9]
 It seems apparent that Illinois has not seen fit to impose liability on sellers who do not label their goods. Neither the discussions in the opinions below nor the briefs before us cite any Illinois statute or decision requiring labeling
 
 
 [10]
 Judge Garth, concurring, said that if all the factual material were properly before the court of appeals, he "would have strenuously urged a different disposition on the merits as to the 'palming off' issue" on the basis of Sears and Compco, 579 F.2d at 792
 
 
 [11]
 This reads:
 (a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.
 
 
 [12]
 This was natural since neither Stiffel nor Day-Brite made any claim under § 43(a). The Lanham Act was cited to the Supreme Court only by the Government's Amicus brief in a Cf. type of reference to the refusal to grant trademark registration to functional configurations in Application of Deister Concentrator Co., 289 F.2d 496, 48 CCPA 952 (1961)
 
 
 [13]
 A contrary argument could be constructed on the basis that Art. I, § 8, authorizes Congress to secure "to Authors and Inventors the exclusive Right to their respective Writings and Discoveries" only "for limited times." See Bender, Product Simulation, 64 Colum.L.Rev. 1228, 1230 (1964). However, nothing in the Sears and Compco opinions suggests that the Court was aiming shafts at Congress, and it would be hard to argue that the time limitation on the power of Congress to protect "writings and discoveries" limits its power under the commerce clause to protect trademarks or other symbols of origin. A commentator has categorically declared that "Sears-Compco do not affect rights under other federal statutes." Dannay, The Sears-Compco Doctrine Today: Trademarks and Unfair Competition, 67 Trademark Reporter 132, 143 (1977)
 
 
 [14]
 After quoting the passage from Compco which we have quoted above, the court characterized the Supreme Court's language as dictum, 536 F.2d at 1214. We would say rather that it did not purport to be addressed to rights recognized by § 43(a) of the Lanham Act
 It is of interest that, as noted in Comment, Product Simulation in the Eighth Circuit, 57 Neb.L.Rev. 91 (1978), the trial court eventually decided that, because of the extensive sales by Fruehauf, the shape was not identified with plaintiff as source, and modified the injunction merely to prohibit the deceptive advertising and to require labeling.
 
 
 [15]
 While color was held to be functional in Smith, Kline & French Labs v. Clark & Clark, supra, 157 F.2d at 730, this was because white was the natural color of the tablets and there would be some extra cost in coating them. Here the defendants must place the powder in a capsule and one color is no more expensive than another
 
 
 [16]
 Mr. Swenson is trademark counsel to Eli Lilly & Co
 
 
 [17]
 In 12 instances the product was labeled as Cyclospasmol