**LE SPORTSAC, INC.,** Plaintiff,

v.

**DOCKSIDE RESEARCH, INC.,** Executive Travelware, and Dockside Research, Inc. d/b/a PAX, Defendants,

v.

**Melvin SCHIFTER,** Additional Defendant Named on the Counterclaim.

**No. 79 Civ. 2965 (KTD).**

United States District Court, S. D. New York.

Aug. 7, 1979.

Greenbaum, Wolff & Ernst, New York City, for plaintiffs; Roger Bryant Hunting, James L. Adler, Jr., Marcia B. Paul, James H. Stark, New York City, of counsel.

Kirschstein, Kirschstein, Ottinger & Cobrin, P. C., New York City, for defendants; Alan Israel, New York City, of counsel.

## OPINION & ORDER

KEVIN THOMAS DUFFY, District Judge:

Plaintiff, Le Sportsac, Inc., has brought this action charging that defendants Dockside Research, Inc., Executive Travelware, and Dockside Research, Inc., d/b/a Pax [hereinafter sometimes collectively referred to as "Pax"] are guilty of common law trademark infringement, unfair competition, both statutory and common law, and violations of the New York's antidilution statute, § 368–d N.Y.G.B. Law. Plaintiff is the manufacturer of high fashion bags and other items made of color-coated ripstop nylon, trimmed with cotton carpet tape and carried by means of web straps. Defendants have been marketing a line of products identical to that manufactured by plaintiff save for the omission of the Le Sportsac logo which is repetitively printed on the carpet tape trimming that which adorns plaintiff's products and the addition of a label bearing defendants' trademark.

Plaintiff has now moved for a preliminary injunction enjoining defendant from (a) manufacturing, selling, distributing, or otherwise fabricating a line of goods that would infringe upon or trade upon the Le Sportsac name, mark or line of goods; (b) from using the mark or logo of Le Sportsac or any colorable imitation thereof on any line of goods; and (c) from using the Le Sportsac name or logo or any colorable imitation thereof on any tags, wrappings, advertising material, publicity or promotional material, or in any manner whatsoever in connection with any line of goods. Prior to the hearing on the application for relief pendente lite, depositions of both parties were taken with officers of each testifying. These depositions, together with various affidavits and exhibits are presently before me. The parties have stipulated that an evidentiary hearing is unnecessary and ask that I render my decision based upon the documentary evidence heretofore submitted. The following shall constitute my findings of fact and conclusions of law.

## FACTS

The Le Sportsac line of goods consists of bags used for travel as well as accessories made of a color-coated ripstop nylon which plaintiff contends was especially developed for it. The products are available in a wide variety of colors and are trimmed with 100

percent cotton carpet tape in black or tan. The bags are carried by means of 1½ inch straps made of herringbone weave cotton webbing of the same color as the carpet tape trim. On many products the cotton trim is fastened by means of brass plated rivets. The larger bags may be locked by means of a brass lock and key.

Most of the Le Sportsac bags are opened and closed by means of a double ended zipper which goes almost all around the bag. The color of the zipper is coordinated with that of the carpet tape. The zippers are pulled by means of hollow metal sliders in a rectangular shape. Many of the Le Sportsac bags also have zippered compartments that employ the same hollow metal sliders.

Le Sportsac products are sold to the public together with a zippered pouch into which the Le Sportsac products may be folded and stored. Plaintiff calls this pouch the "tuckabagaway pouch" and contends that it originated and developed the storage pouch concept on bags of ripstop nylon.

Another feature of the Le Sportsac line is the logo of Le Sportsac which is repetitively printed on the cotton trim of each of the products. The logo consists of a bright green circle followed by white stylized letters spelling the name Le Sportsac and enclosed by a light colored elongated ellipse. The circle, lettering and ellipse all appear against a dark elliptical background.

The Pax line of products, which first appeared in September, 1978, is remarkably similar, if not identical to that manufactured by plaintiff. Indeed, Arthur Freedman, the president of defendant Dockside, has admitted that he copied certain Le Sportsac products and that there are no differences between those copied products and Pax's line except for the absence of the Le Sportsac logo. Mr. Freedman testified that twenty-one of the twenty-three items in defendants' line are copied from the Le Sportsac line. Deposition of Arthur Freedman at 13. He further testified that de-fendants have advertised, promoted and sold Pax products by means of a catalogue that contained photocopies of plaintiff's products although they no longer do so. It also appears that in 1978 Pax's products were marketed with a hangtag that featured a bright blue circle followed by white stylized letters spelling the name Pax, together with text, enclosed in an elongated blue ellipse on a black background. Freedman testified that it is defendants' practice to "market what the market wants . . . if buyers come to you and suggest this is hot, that is hot, do it; you do it." *Id.* at 25.

Although aware of the Pax line since August, 1978, plaintiff did not commence the instant action until June, 1979, some ten months later. Plaintiff asserts that the continued marketing of the Pax line will cause it irreparable injury and that defendants' actions constitute violations of its rights under the trademark laws.

## DISCUSSION

■ The standards for granting a preliminary injunction are well settled. The party seeking such relief must establish both possible irreparable injury and either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. *Selchow & Righter Co. v. McGraw-Hill Book Company*, 580 F.2d 25, 27 (2d Cir. 1978).

Plaintiff asserts that it has shown a likelihood of success on the merits or, at the least, substantial questions going to the merits and a balance of hardships in its favor. It contends that it has a common law trademark in the Le Sportsac name and logo, as well as in the nonfunctional design aspects of its product. On this motion, only the latter assertion need be considered since defendants have altered their hangtag so as

to eliminate confusion with the Le Sportsac logo.[1]

Plaintiff contends that the unique combination of design features of its bags serves to identify these products as its own and vouches for their quality. It argues that by virtue of these features, its products have achieved trademark status and may not be copied with impunity.

Defendants on the other hand, urge that no such status has been achieved and that based upon *Sears, Roebuck & Co. v. Stiffel Lamp Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) and *Compco Corp. v. Day-Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964) they are free to copy every detail of plaintiff's product as they wish. In *Sears* and in *Compco* the United States Supreme Court held that a state's unfair competition law may not, consistently with federal patent laws, impose liability or prohibit the copying of an article that is not protected either by a federal patent or a copyright. In both cases the Court was faced on the one hand with unpatented and unpatentable products (a pole lamp in *Sears,* a fluorescent light fixture in *Compco*) and at the same time with lower Court rulings that the state law of unfair competition had been violated. The Court would not permit this conflict between the state and federal laws, for to forbid copying would interfere with the federal policy "of allowing free access to copy whatever the federal patent and copyright laws leave in the public domain." *Compco, supra,* at 237, 84 S.Ct. at 782. In broad language which has generated a great deal of controversy, *see generally* Dannay, *The Sears-Compco Doctrine Today: Trademarks and Unfair Competition,* 67 Trademark Reporter 132 (1977), the Court seemingly dealt the death blow to state claims based on copying or misappropriation:

As we have said in *Sears,* while the federal patent laws prevent a State from prohibiting the copying and selling of unpatented articles, they do not stand in the way of state law, statutory or decisional, which requires those who make and sell copies to take precautions to identify their products as their own. A State of course has power to impose liability upon those who, knowing that the public is relying upon an original manufacturer's reputation for quality and integrity, deceive the public by palming off their copies as the original. That an article copied from an unpatented article could be made in some other way, that the design is "nonfunctional" and not essential to the use of either article, that the configuration of the article copied may have a "secondary meaning" which identifies the maker to the trade, or that there may be "confusion" among purchasers as to which article is which or as to who is the maker, may be relevant evidence in applying a State's law requiring such precautions as labeling; however, and regardless of the copier's motives, neither these facts nor any others can furnish a basis for imposing liability for or prohibiting the actual acts of copying and selling.

1. The hangtags in current use are illustrated below:

*Compco, supra,* at 238, 84 S.Ct. at 782. Despite this broad language which has been characterized by one Court as dictum, *Truck Equipment Service Co. v. Fruehauf,* 536 F.2d 1210, 1214 (8th Cir. 1976), many courts have viewed the actual holdings of the cases narrowly. For example, the facts of both *Sears* and *Compco* involved the copying of product shapes and not their packaging, also known as trade dress. Thus, it has been commonly found that trade dress is protectible and not barred by the *Sears-Compco* doctrine. *See, e. g., Loctite Corp. v. B. Jadow & Sons, Inc.,* 177 U.S.P.Q. 410 (S.D.N.Y.1973); *Samson Cordage Works v. Puritan Cordage Mills,* 243 F.Supp. 1 (W.D.Ky.1964); *Pet Needs, Inc. v. T.F.H. Publications,* 156 U.S.P.Q. 479 (N.Y. Sup.Ct.1967). In addition, our Court of Appeals has recently held that the *Sears-Compco* doctrine did not address itself to rights recognized by Section 43(a) of the Lanham Act which makes certain kinds of unfair competition federal statutory torts.[2] *Ives Laboratories v. Darby Drug Co., Inc.,* 601 F.2d 631 (2d Cir. 1979). In that case the Court noted that

> [i]t is surely true that in the *Sears* and *Compco* opinions the Supreme Court said nothing about the federal tort created by Section 43(a). Stiffel's and Day-Bright's claims were treated as resting solely on state unfair competition law which was held invalid as in conflict with Federal patent law. The opinions can be read as limited to rights claimed under state unfair competition law granting protection equivalent to that of the Federal patent or copyright laws for products not enjoying valid patent or copyright protection. The Court, it can be strongly argued, had no need to be concerned with marking out the boundaries of a federal tort over

which it had complete control and which Congress could contract if the courts were pressing it further than that body desired. The Eighth Circuit took essentially this position in *Truck Equipment Service Co. v. Fruehauf Corp.,* 536 F.2d 1210, 1214–15, *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976). The court there sustained the claim under Section 43(a) for copying the exterior design of a hopper grain trailer which was found to be nonfunctional and to have acquired a secondary meaning. While we previously left this question open . . . we are now prepared to agree with the Eighth Circuit.

*Id.* at 642.

Plaintiff relies both upon the nonfunctional design aspects of its trade dress and its Lanham Act claim to take it out of the *Sears-Compco* doctrine. In order to prevail on its claims of either common law trademark infringement or unfair competition, however, it must be shown that the features copied by Pax were nonfunctional and that they have achieved secondary meaning. *See, e. g., Application of World's Finest Chocolate,* 474 F.2d 1012 (C.C.P.A.1973); Application of *Mogen David Wine Corp.,* 328 F.2d 925, 51 C.C.P.A. 1260 (1964). *See also Ives Laboratories, supra,* wherein the Court of Appeals reaffirmed the formula for success under Section 43(a) of the Lanham Act:

> Imitation of the physical details and designs of a competitor's product may be actionable, if the particular features imitated are "nonfunctional" and have acquired a secondary meaning. *Crescent Tool Co. v. Kilborn & Bishop Co.,* 247 F. 299 (2d Cir. 1917). But, where the features are "functional" there is normally no right to relief. 'Functional' in this

---

**2.** 15 U.S.C. § 1125(a) provides

> Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation

of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

sense might be said to connote other than a trademark purpose. If the particular feature is an important ingredient in the commercial success of the product, the interest in free competition permits its imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demands in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made. Under such circumstances, since effective competition may be taken without imitation, the law grants protection.

601 F.2d at 642–643 quoting *Pagliero v. Wallace China Co.*, 198 F.2d 339, 343 (9th Cir. 1952).

Plaintiff contends that it has met these criteria. One of its principals, Melvin Schifter has described the nonfunctional design features of the Le Sportsac line as follows:[3]

a. The web straps primarily contribute to "the design or the dress appearance of the bag", p. 11, 1. 22.

b. The brass lock and key plays "primarily a dress function, a unique characteristic that we introduced into this type of bag", p. 12, 1. 25.

c. The double-ended nylon zipper is "primarily a device that we thought of to enhance the looks of the bag. There is no . . . particular functional reason for them", p. 13, 1. 12.

d. The tuckabagaway pouch was developed primarily "to dress [the bags] up a little bit more and make them . . to be easily handled by both a store and a consumer", p. 14.

e. The brass rivets might have been replaced by stitching, but were chosen "to make [the bags] look better in our view, to dress it up more by putting these rivets on it", p. 15.

f. The carpet tape used around the edges of the bags as a background for the Le Sportsac logo was nonfunc-

tional in that it served to display the logo to prospective customers in order to help sell the product, p. 17.

g. The hollow rectangular zipper pull and the color used on the slider were completely nonfunctional, pp. 18–19.

h. The use of cross-bar webbing and some stripes of webbing that were deliberately placed off center were purely nonfunctional design features, pp. 20, 27.

i. The use of a wide strip of webbing on each side of the zipper was unnecessary and this webbing, including its continuation along both sides of the bag, is nonfunctional, p. 22.

j. The use of particular colors developed by and for Le Sportsac with contrasting trim represents a nonfunctional design aspect of the bag, pp. 22–25.

k. The use and positioning of a series of pockets along the outside of the bag, particularly in connection with the garment bag, is a nonfunctional design element, p. 27.

Pax, on the other hand, argues that all these features are in fact functional. The color-coated ripstop nylon has the function of being water-resistant, tear-resistant and foldable. The cotton web straps support the bag and make it easy to carry. The double-ended zippers are to open and close the bag and the tuckabagaway pouch is for storage purposes. Finally, the rivets close off the end of the bag. Defendant's Brief in Opposition to the Motion for Preliminary Injunction at 8–9. Of course, the fact that some of these features serve a utilitarian function does not detract from the fact that in terms of design they may be essentially nonfunctional. *World's Finest Chocolate, supra.* In this case, plaintiff argues that the design elements of its bags are used in this essentially nonfunctional way, as a dress for its bags, an "arbitrary embellishment." *Pagliero v. Wallace*, 198 F.2d 339, 343 (9th Cir. 1952). Although the shape of its product is clearly in the public domain, *Sears, supra; Compco, supra,* these design elements may be protected if they serve an identifying function.

**3.** References are to the deposition of Melvin Schifter taken June 11, 1979.

An inspection of plaintiff's product lends support to this view of nonfunctionality. For example, while zippers do serve a function, the hollow sliders employed on the Le Sportsac bags would appear to be essentially decorative. The same may be said for the cotton webbing which adorns the bags, particularly the off-center stripes on the front. Additionally, the double zippers have no particular function and the rivets that are used on the pouch are more decorative than they are functional. Indeed, the entire composition of the bags tend to lend it a particular "look" which apparently was intended to serve a trademark purpose, to wit: identification. It would not seem that the particular configuration of dress elements employed by plaintiff and copied by Pax are essential to the commercial success of the product. Straps could be thinner or thicker, webbing could be positioned differently and zippers need not be hollow or double-ended for the bags to serve their function of carrying articles. Indeed, defendants have submitted a number of examples of products which they claim are "virtually identical to both the Pax line and the Le Sportsac line," Defendant's Brief at 9, but which, in fact, differ from those lines in many of the ways outlined above.[4]

In short, I believe that plaintiff has gone a long way toward establishing that its bags are "dressed" in a number of nonfunctional design elements adopted for purposes of identification and individuality. I turn now to the question of secondary meaning.

■ Secondary meaning connotes the association in the mind of the public of the trademark with the source of the goods. *See Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694 (2d Cir. 1961). It must be shown

> that the design is a mark of distinction identifying the source of the article and that purchasers are moved to buy it because of its source.

*Id.* at 697 *citing Lucien Lelong v. Lander Co.*, 164 F.2d 395, 397 (2d Cir. 1947). In addition, secondary meaning must have been established when the alleged infringer entered the market.

Since plaintiff has at the least raised serious questions concerning the design elements which lend its products a "mark of distinction" the question is whether these elements serve to identify the product with plaintiff and whether the public is moved to buy the article because plaintiff is its producer.

On the question of secondary meaning, plaintiff has submitted evidence concerning the marked increase of product sales between 1977 and 1979, the extensive advertising undertaken, as well as the numerous unsolicited articles and news stories about the Le Sportsac product in magazines and newspapers. According to agreements entered into with department and specialty stores, Le Sportsac products must be sold in their own separate "environment" and not intermingled with other goods. In June, 1978, an article in *The New Yorker* magazine indicated that a pedestrian, stopped at random, identified his tote bag as "Le Sportsac" and praised its quality. An affidavit of a department store buyer was submitted which indicated that customers often come into the store asking for Le Sportsac. Additionally, the Le Sportsac bags were the subject of a television spot on a nationally broadcast morning television program, "Good Morning America." In my view the foregoing is substantial evidence of secondary meaning. *See, generally Time Mechanisms v. Qonaar*, 422 F.Supp. 905 (D.N.J.1976). Most persuasive, however, is the inference of secondary meaning that arises by virtue of defendants' own admissions and the act of copying almost every detail of plaintiff's product. For as Freed-

---

**4.** Of the examples offered, a number of bags are manufactured by Roger Schoenfeld under the name "Wild Duck." All are readily distinguishable from Le Sportsac line. For instance, Ext. 6 to the Schoenfeld Affidavit, which is the only bag that comes close to employing the Le Sportsac design elements, uses shiny straps and trim and has neither hollow zipper pulls nor brass rivets. Other bags offered in evidence have different design configurations and/or utilize a ripstop nylon that is notably different in appearance and touch from that utilized by plaintiff.

man observed, he "market[s] what the market wants." Affidavit of Arthur Freedman at 25. Since the market (i. e. the public) apparently wanted Le Sportsac, a copy of that product is what defendants gave them. *See generally Ives Laboratories, Inc. v. Darby Drug Co., Inc.,* 455 F.Supp. 939, 950 (S.D.N.Y.1978), *aff'd* 601 F.2d 631 (2d Cir. 1979); *Scholl v. Tops E.H.R. Corp.,* 185 U.S. P.Q. 754 (E.D.N.Y.1975).

■ Having found that plaintiff has at the least raised serious questions as to the status of its product, I must consider whether defendants' act of copying constitutes trademark infringement or unfair competition. Critical to my determination is the question whether it is likely that an ordinary prudent person would be confused by the two products. *Maternally Yours, Inc. v. Your Maternity,* 234 F.2d 538 (2d Cir. 1956). In this respect, I must conclude that plaintiff's proof breaks down. While it is true that the products in question are virtually identical in their nonfunctional design features, they are different in two crucial respects. Plaintiff's logo is prominently and repetitively printed across the cotton carpet tape trimming on its bags. By contrast, defendants employ sewn-in labels on their bags and pouches which feature the trademark Pax[R]. Their hangtag also prominently feature the Pax trademark as does all the advertising connected with the product. This labeling tends to eliminate the confusion that might otherwise result from the sale of such similar products. As our Court of Appeals has observed, "there is hardly likelihood of confusion . . . when the name of the manufacturer is clearly displayed." *Bose Corporation v. Linear Design Labs, Inc.,* 467 F.2d 304, 310

(2d Cir. 1972). Plaintiff has offered no evidence to overcome the apparent presumption that confusion as to origin will not arise where such labeling occurs.[5] Accordingly, at this juncture, on a motion for extraordinary relief, I am loath to enter an injunction without proof that confusion is, in fact, likely.[6]

■ I also hesitate to grant plaintiff's motion for a wholly separate reason. Although plaintiff contends that it will be irreparably harmed should defendants' activities not be enjoined, it has waited nearly a year before seeking any relief. Delay of this nature undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.[7] *See Programmed Tax Systems, Inc. v. Raytheon Co.,* 419 F.Supp. 1251 (S.D.N.Y.1976); *Gianni Cereda Fabrics v. Bazaar Fabrics, Inc.,* 335 F.Supp. 278 (S.D.N.Y.1971); *Le Cordon Bleu v. BPC Publishing Ltd.,* 327 F.Supp. 267 (S.D.N.Y.1971). Plaintiff has offered no adequate excuse for its delay. Moreover, the cases on which it relies in support of its suggestion that the delay was not unduly long for the most part involved permanent rather than preliminary injunctions. *See, e. g., Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331 (2d Cir. 1975); *Tisch Hotels v. Americana Inn, Inc.,* 350 F.2d 609 (7th Cir. 1965); *Baker v. Simmons Co.,* 307 F.2d 458 (1st Cir. 1962). Whether plaintiff's inaction will ultimately bar its claim is not a question I need address today. However, for purposes of this motion "[p]laintiff's claimed need for immediate relief is undercut by the slow pace with which plaintiff has sought to obtain it." *Gianni Cereda, supra,* at 280.

---

**5.** This failure to demonstrate likely confusion also bars injunctive relief based upon New York law. *Girl Scouts of America v. Personality Posters Mfg. Co.,* 304 F.Supp. 1228, 1233 (S.D.N.Y.1969).

**6.** My conclusion that confusion is unlikely is enhanced by the fact that there are presently so many variations of the ripstop nylon compressible bag on the market. With such variety of styles to choose from a customer seeking Le Sportsac is likely to be careful that he or she is

buying the right item. In addition, Le Sportsac is sold only in its own "environment." Thus, if one seeks Le Sportsac it can readily be found.

**7.** Irreparable injury is also somewhat dubious, where, as here, plaintiff's sales have increased "exponentially", (Deposition of Melvin Schifter at p. 51), notwithstanding defendants' entry into the market. From all the evidence it appears that plaintiff's business is thriving with no sign that a decline is imminent.

Accordingly, for failure to demonstrate either likelihood of confusion or irreparable injury, plaintiff's motion for preliminary relief is denied.

SO ORDERED.